UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DELBERT STURM, an individual, RICHARD D. FERGUSON, an individual, DWAYNE VOLK, an individual, STAN DALRYMPLE, an individual, OCTAVIO CRUZ, JR., an individual, CANTOS REYES, an individual, JASON MILLER, an individual, PAT STEPHEN GUNN, an individual, CHRIS HOLMAN, an individual, and JOHN DOES 1-20,<br><br>Plaintiffs,<br><br>v.<br><br>CB TRANSPORT, INC., a foreign corporation,<br><br>Defendant. | Case No. 1:12-cv-109-CWD<br><br>**MEMORANDUM DECISION AND ORDER - AMENDED** |

## INTRODUCTION

Plaintiffs are the former and current employees of Defendant CB Transport, Inc., a trucking company that hauls raw milk from Idaho and Oregon dairy farms to Darigold processing plants, and then takes the finished product to Darigold customers. Plaintiffs claim that under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., they are entitled to back pay for time worked over 40 hours per week. CB moved for summary judgment, arguing Plaintiffs are not entitled to overtime pay because the entire pool of

**MEMORANDUM DECISION AND ORDER - 1**

milk tanker drivers falls under the Motor Carrier Act exemption to the FLSA. CB argues also that Plaintiffs' state law claims are either preempted by the FLSA, barred by the state law statute of limitations, or fail as a matter of law. Finally, CB argues that summary judgment must be granted as to the claims made by Plaintiffs who did not respond to the motion for summary judgment, because Plaintiffs are not a certified class.

Additionally, Plaintiffs filed a motion to amend their complaint to add named plaintiffs in place of the John Does, and to add a claim of willful violation under the FLSA. CB does not contest the addition of the claim for willful violation of the FLSA. But, CB opposes the addition of new plaintiffs, arguing the delay and prejudice is sufficient to warrant denial of the motion. If the motion to amend is granted, CB contends that the newly named Plaintiffs should not be permitted to avail themselves of the relation back doctrine for statute of limitations purposes.

The Court conducted a hearing regarding the motions on April 15, 2013. After careful consideration of the parties' arguments, their memoranda, and the evidentiary record presented, the Court will deny CB's Motion for Summary Judgment, and grant Plaintiffs' Motion to Amend, as discussed below.

## FACTS

### 1.    Undisputed Facts

In support of its motion, CB described its operations in detail. CB Transport, Inc., is headquartered in Stanwood, Washington, and is owned by Bruce and Royce Carlson. In 2006, CB acquired a trucking company involved in the dairy hauling business, and began operating in and around Caldwell, Idaho, in 2006.

**MEMORANDUM DECISION AND ORDER - 2**

CB contracts with dairy farms and dairy processing plants to haul raw milk and processed dairy products. On the first leg of the milk's journey, CB picks up raw milk from dairy farms located in Idaho and Oregon and transports the milk to the dairy processing plants, which were located in Caldwell, Jerome, and Boise, Idaho. The dairy processing plants were owned and operated by Darigold, CB's main customer. Between September 2009 and August 2012, CB hauled raw milk from fifty different farms. Approximately 35-40 farms were located within Idaho, while the other 10-15 farms were located in Oregon. On average, 4% of CB's total raw milk hauls originated from Oregon dairy farms.

The second aspect of CB's hauling business consisted of "interplant" hauling of processed milk. CB would haul milk, buttermilk, condensed milk, and cream from one processing plant to another. The processing plants were located in Idaho, Washington, Oregon, and on occasion, Utah. The location of the plants did not change, but the volume of dairy product transported between plants, as well as the frequency of interplant hauls, varied from month to month. (Carlson Aff. ¶10, Dkt. 38.) The variation could be caused by customer orders, or mechanical problems requiring re-routing, among other things. On average, between September 2009 and August 2012, 14% of the total interplant hauls were interstate hauls.

The milk tanker trucks originated from the Caldwell Plant, located in Caldwell, Idaho. Ryan Thompson has been the plant manager in Caldwell since 2009. Between September 2009 and August 2012, CB employed between 25 and 35 milk tanker drivers.

**MEMORANDUM DECISION AND ORDER - 3**

The tanker drivers operated milk tankers weighing 26,000 or more pounds when not loaded with milk or milk products.

Plaintiffs in this case were employed as milk tanker drivers by CB, and hired to drive milk tankers filled with raw milk, and processed milk and dairy products. Plaintiffs, like all CB tanker drivers, were expected to maintain a Class A commercial driver's license to operate the milk tanker trucks, as well as have knowledge about federal regulations affecting interstate commerce. This knowledge included compliance with Federal Department of Transportation ("DOT") regulations. CB required its drivers to maintain compliance with Federal Department of Transportation regulations and Federal Motor Carrier Safety Regulations ("FMCSR"). (Carlson Aff. ¶ 15-16, Dkt. 38.)

Caldwell Plant Manager Ryan Thompson primarily was responsible for scheduling CB drivers. Each year, he assigned CB drivers to regular routes, which the driver would drive multiple days each week. The drivers assigned to these regular routes were subject to change, and could change, depending upon hiring or firing of employees, customer orders, mechanical problems, plant closures, or other reasons. The milk tanker drivers were not able to choose their own routes, and Thompson scheduled drivers to these regular routes without regard to driver preference. Thompson also reassigned drivers to other regular routes, and could assign any driver to a route that involved interstate travel, because all of CB's drivers were eligible to make interstate trips for deliveries.

There were various types of regular, assigned routes. For example, some milk tanker drivers drove routes hauling raw milk from Oregon and Idaho dairy farms to Idaho processing plants. Other drivers hauled raw milk from Idaho dairy farms to Idaho

**MEMORANDUM DECISION AND ORDER - 4**

processing plants. Other drivers drove a pre-determined route between Caldwell, Idaho, and Issaquah, Washington, several times each week. And still other drivers hauled interplant loads between plants located in Idaho, or between Idaho and out-of-state plants. Some regular routes were entirely restricted to travel within Idaho. Other regular routes involved travel between Idaho and other states. The routes either ended at or originated at a milk processing plant. For example, some drivers would be assigned a route to pick up raw milk from farms in Oregon and Idaho, and deliver it to a processing plant in Idaho. Then, once the milk was processed into, for example, buttermilk, another CB driver would load the buttermilk at the Idaho processing plant, and transport it to another location in Idaho or in Washington, Utah, or Oregon. (Carlson Aff. ¶22 Dkt. 38; Thompson Aff. ¶10 Dkt. 39.)

In addition to a driver's regular assigned route, a driver could be assigned additional loads or hauls periodically. These additional assignments could occur due to plant shut downs, or because of customer orders, or due to internal staffing needs, such as an employee illness or vacation. Any CB driver could be asked to handle such an additional assignment. When selecting a particular driver to haul an additional load or to assist on another route, Thompson looked at a variety of factors, but primarily selected drivers based on their availability and location at the time he learned that a scheduling adjustment was necessary. Efficiency and flexibility were important, because CB hauled a perishable product, and so the ability to adapt to unexpected events was critical. Thus, Thompson selected a driver from his pool of drivers to fill an "emergency" route or pick

**MEMORANDUM DECISION AND ORDER - 5**

up a route for an absent driver based upon efficiency considerations and driver availability at that moment.

With regard to the individual Plaintiffs, Thompson identified that five of the nine named Plaintiffs drove across state lines between September 2009 and September 2012. Octavio Cruz hauled processed milk and dairy products from Caldwell, Idaho, to Issaquah, Washington, a total of 44 times between October 2010 and April 2012. Stanley Dalrymple hauled milk and dairy products from Caldwell, Idaho, to Portland, Oregon, and to Issaquah, Washington, on seven occasions. Richard Ferguson hauled processed milk products between Caldwell, Idaho, and Ontario, Oregon, on 34 occasions between January and December 2010. Delbert Sturm hauled milk between Caldwell, Idaho, and Ontario and Nyssa, Oregon, on September 1, 2009. Dwayne Volk hauled processed dairy products from Caldwell, Idaho, to Ontario and Vale, Oregon, on four occasions in September 2009.

In March 2010, the United States Department of Labor conducted an investigation of CB Transport's overtime pay practices. The investigation resulted from a complaint from a driver alleging he had worked overtime in three work weeks while employed as a driver, but that he did not receive overtime pay. The DOL requested documentation of hours worked and payroll records covering the period between March 31, 2008, through March 30, 2010. CB supplied the documentation to the investigator. The DOL Audit concluded that the employee was exempt from overtime because he was in a pool of drivers who could be called to perform interstate deliveries at any time. (Smith Decl. Ex. 9, Dkt. 46-4.) Further, the Department of Labor concluded that all nineteen drivers and

**MEMORANDUM DECISION AND ORDER - 6**

two mechanics employed by CB at the time were exempt from the overtime pay provisions of the FLSA, concluding that all of CB's drivers could be called to deliver products to Oregon, Washington, or Utah. (*Id.*)

After the audit, CB continued to engage in the same hauling and pay practices as described above.

Four Plaintiffs—Sturm, Cruz, Ferguson, and Dalrymple—submitted affidavits characterizing the facts differently than CB did, although they do not dispute the nature of CB's operations. Sturm was employed by CB from November 1, 2006, to February 21, 2011, as a truck driver transporting raw milk on regular routes between dairy farms located in Idaho to Darigold processing plants, also located in Idaho. Once the product had been unloaded at the processing plant, the raw milk was transformed into consumer products such as pasteurized milk, cottage cheese, and butter, among other products. Sturm was never asked to travel interstate after September 2, 2009,[1] and he continued to drive the same route for the remainder of his employment. (Sturm Aff. Dkt. 56-1.) Sturm stated that relief drivers were assigned to cover other drivers' assigned routes. (Sturm Aff. ¶ 11, Dkt. 56-1.)[2]

Cruz was employed by CB from September 27, 2010, to May 24, 2012, as a truck driver transporting cream loads to and from Darigold processing plants. He drove a

---

[1] Sturm therefore does not dispute Thompson's statement that he hauled milk between Caldwell, Idaho and Ontario and Nyssa, Oregon on September **1**, 2009.

[2] CB filed an evidentiary objection, objecting to the identical statement contained in the Ferguson and Cruz affidavits, but not to the identical statement in the Sturm affidavit. The Court will discuss the evidentiary objection to this statement later in this memorandum. The Court did not consider the remainder of CB's evidentiary objections, because the objectionable evidence was not material for purposes of resolving CB's motion for summary judgment.

regular route throughout his employment between Darigold's processing plants in

Caldwell or Boise, Idaho, and Jerome, Idaho, and never was asked to cover another

driver's assigned route. Cruz "never ran an interstate route during the entirety of [his]

employment with Defendant." (Cruz Aff. ¶10, Dkt. 56-2.) [3] Cruz also stated that relief

drivers were assigned to cover other drivers' assigned routes. (Cruz Aff. ¶ 9, Dkt. 56-2.)

CB employed Ferguson between November 1, 2006, and December 17, 2010, as a

truck driver transporting raw milk on regular routes between dairy farms within Idaho to

a processing plant within Idaho. Ferguson continued to drive his assigned route,

transporting raw milk to the processing plant, from October of 1998 to January 24, 2010.

After January 24, 2010, his route changed to include picking up raw milk at dairies in

Ontario, Oregon, because the McKee Dairy in Cambridge, Idaho, which was previously

on his route, had closed. [4] Prior to this reassignment, he had not been asked to travel

interstate. Ferguson also echoed that relief drivers were assigned to cover other drivers'

assigned routes. (Ferguson Aff. ¶11, Dkt. 56-3.)

Dalrymple was employed by CB from January 5, 2010, to April 5, 2012, as a milk

tanker driver who drove two types of regular routes transporting cream loads to and from

Darigold processing plants, and also delivering raw milk from dairy farms to Darigold

processing plants. Dalrymple's first assigned route, which he drove from January 5, 2010,

---

[3] Cruz's statement is in direct conflict with the evidence submitted by CB, which indicated Cruz hauled processed milk and dairy products from Caldwell, Idaho, to Issaquah, Washington, a total of 44 times between October 2010 and April 2012. (*Compare* Cruz Aff. ¶ 10, Dkt. 56 with Thompson Aff. ¶ 11, Ex. 10, Dkt. 39; Carlson Aff., ¶¶ 27-29, Ex. 10, Dkt. 38.) The Court is not in a position to weigh this dispute at the summary judgment stage, but does not consider the dispute material for purposes of deciding the motion.
[4] Thompson stated in his affidavit that Ferguson hauled processed milk products between Caldwell, Idaho, and Ontario, Oregon, on 34 occasions between January and December 2010.

**MEMORANDUM DECISION AND ORDER - 8**

to approximately June 28, 2010, required him to travel between either Caldwell or Boise,

Idaho, and Jerome, Idaho. In February 2010, Dalrymple drove from Idaho to the Darigold

plant in Portland, Oregon, and drove three runs to the Darigold plant in Issaquah,

Washington.[5] CB asked Dalrymple to continue driving interstate runs, but Dalrymple

declined to do so. After February 2010, he did not make any trips outside of the state of

Idaho, and continued to drive regular routes between the Jerome, Idaho Darigold plant

and other Darigold plants located in Idaho.

At the beginning of August 2010, Dalrymple was "reassigned from the cream

route to be a relief driver for Delbert Sturm and Ron Wolfe." (Dalrymple Aff. ¶ 6, Dkt.

56-4.)[6] As a relief driver, he transported raw milk from Idaho dairies to Darigold's Idaho

processing plants. When Sturm was terminated from his employment on February 21,

2011, Dalrymple was reassigned to be the principle driver for Sturm's routes. From

February 21, 2011, until he left his employment, Dalrymple ran the same routes as Sturm

had, between Idaho dairy farms and Idaho processing plants. At no time after February

21, 2011, were his routes reassigned or changed, and he was not asked to travel interstate.

(Dalrymple Aff. Dkt. 56-4.)

## 2.    Evidentiary Objection

Rule 56 of the Federal Rules of Civil Procedure requires affidavits used to support

or oppose a motion for summary judgment to be made on personal knowledge, and set

---

[5] Thompson stated in his affidavit that Dalrymple hauled milk and dairy products from Caldwell, Idaho to Portland Oregon and Issaquah, Washington on seven occasions. The exact number of times, whether three or seven, that Dalrymple made an interstate run is not material for purposes of deciding the motion.
[6] CB did not object to this statement. (*See* Dkt. 57.)

**MEMORANDUM DECISION AND ORDER - 9**

out facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4). An opposing

party may object to material cited to support or dispute a fact if it cannot be presented in a

form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2). CB filed an

evidentiary objection to the statement, "Relief drivers were assigned to cover certain

other driver's [sic] assigned routes," which appeared in both Ferguson's and Cruz's

affidavit. (Objection, Dkt. 57-1.)[7] The same statement appeared in Sturm's affidavit, but

CB did not include a reference to Sturm's statement in its objection.

CB objected to the statement on the grounds that the Plaintiffs' statements lack the

necessary personal knowledge and foundation to constitute admissible evidence, because

they provide no information regarding where their knowledge of relief drivers came from

or the basis for their knowledge. CB objects also on the grounds that the statements rely

upon the statements of others, which would constitute inadmissible hearsay under Fed. R.

Evid. 801(a), (b), and 802.

The objection is overruled. The objectionable statement is relevant to support

Plaintiffs' assertion that they drove regular, assigned routes. Because Cruz, Sturm, and

Ferguson worked at CB, they certainly had personal knowledge of CB's route assignment

practices as they understood them. All three testified they drove regular routes.

Undoubtedly, they knew about their own routes, and CB's practice regarding what would

happen if one of them was absent or could not drive. The inference to be drawn from

---

[7] The court appreciates that Defendant did not file a separate motion to strike. Since the 2010 amendments to the Federal Rules of Civil Procedure, the Advisory Committee has stated that parties should submit objections, much like at trial, and "there is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial." Fed. R. Civ. P. 56, 2010 Advisory Committee Note, Subdivision (c)(2).

**MEMORANDUM DECISION AND ORDER - 10**

their statement is that a relief driver would take their route, or another's route. And, Dalrymple's affidavit contains a statement that at the beginning of August 2010, he was reassigned from the cream route "to be a relief driver for Delbert Sturm and Ron Wolfe." CB did not object to Dalrymple's statement. Dalrymple's statement confirms Cruz's, Sturm's, and Ferguson's statement that he was a relief driver. Thus, the Court finds that, for the purpose of this motion, the evidence that there were relief drivers, and that Dalrymple was a relief driver, is admissible.

As for the other objections raised by CB, the Court did not consider the statements material in reaching its decision, and therefore overrules the objections as moot.

## DISPOSITION

**1.     Motion for Summary Judgment**

### A.     Summary Judgment Standard

A principal purpose of summary judgment is to "isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

**MEMORANDUM DECISION AND ORDER - 11**

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 256–57. The non-moving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

The party bearing the burden of proof at trial "must establish beyond controversy every essential element of its ... claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (adopting decision of district court "as our own"). Because CB bears the burden of proving at trial that the exemption applies, to succeed on its summary judgment motion, it must establish beyond controversy every essential element of its claim.

A party who does not have the burden "may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R. Civ. P. 56(c)(1)(B) (advisory committee's note.) Furthermore, as a general rule, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co.*, 336 F.3d at 889. Here, Plaintiffs do not have

the burden but oppose summary judgment. Thus, they may rely on a showing that CB

cannot produce admissible evidence to carry its burden but must direct the Court to

specific triable facts.

### B.     The FLSA's Motor Carrier Act Exemption

Congress enacted the FLSA in 1938 to protect workers from substandard wages.

*Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981). Section

207(a)(1) of the FLSA sets forth the right of employees to receive overtime pay "at a rate

not less than one and one-half times the regular rate" for any hours worked in excess of

40 in any work week. 29 U.S.C.S. § 207(a)(1). Simultaneously, however, Section 213 of

the FLSA specifically exempts certain employers and employees from Section 207

coverage. *Dole v. Circle "A" Construction, Inc.*, 738 F.Supp. 1313, 1316 (D. Idaho

1990). The exemption is known as the "Motor Carrier" exemption. Section 213(b)(1) sets

forth the Motor Carrier exemption and provides the following:

> (b) The provision of section 207 [the FLSA wage/hour
> provision of this title] *shall not apply* with respect to—
> (1) any employee with respect to whom the Secretary of
> Transportation has power to establish qualifications and
> maximum hours of service pursuant to the provisions of
> section 31502 of Title 49[.]

29 U.S.C.S. § 213(b)(1) (emphasis added). In turn, 49 U.S.C. § 31502(b) gives authority

to the Secretary of Transportation to prescribe requirements for:

> (1) qualifications and maximum hours of service of
> employees of, and safety of operation and equipment of, a
> motor carrier; and
> (2) qualifications and maximum hours of service of
> employees of, and standards of equipment of, a motor private
> carrier, when needed to promote safety of operation.

**MEMORANDUM DECISION AND ORDER - 13**

Thus, Section 213(b) "exempts from the overtime compensation provisions those employees who are subject to the jurisdiction of the Secretary of Transportation . . . under the Motor Carriers Act." *Jones v. Giles*, 741 F.2d 245, 249 (9th Cir. 1984).

The term "motor private carrier" as used in Section 31502 is defined as:

> [A]person, other than a motor carrier, transporting property by motor vehicle when—
> (A) the transportation is as provided in section 13501 of this title; [*i.e.*, in interstate commerce];
> (B) the person is the owner, lessee, or bailee of the property being transported; and
> (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(15).

There is no concurrent jurisdiction between the FLSA and Section 31502 of the Motor Carrier Act. *Shoemaker v. United Parcel Service, Inc.*, No. 1:10-cv-185-EJL-CWD, 2011 WL 836998, at *7 (Feb. 10, 2011) (citing *Jones,* 741 F.2d at 249). In other words, if the Motor Carrier Act applies, then the FLSA does not apply. The Department of Transportation ("DOT") has the power to establish qualifications and maximum hours of service pursuant to the provisions of the Motor Carrier Act. *Dole*, 738 F.Supp. at 1318. *See also Morris v. McComb*, 332 U.S. 422, 434 (1947). For a motor carrier to fall within the DOT's jurisdiction, it must transport passengers or property in interstate commerce. 49 U.S.C. § 1502(a)(1); 49 U.S.C. § 13501.[8]

---

[8] Interstate commerce is, for purposes of the Motor Carrier Act, commerce that is "a practical continuity of movement from the manufacturers or suppliers without the state, through a warehouse and on to customers." *Klitzke v. Steiner*, 110 F.3d 1465, 1469 (9th Cir. 1997).

MEMORANDUM DECISION AND ORDER - 14

However, simply because an employer might fall under the DOT's authority, not all of its employees will fall under the DOT's authority by virtue of their employment. *Morris*, 332 U.S. at 436 n.13 (recognizing an employee could be under the jurisdiction of the Department of Labor one week, and the Department of Transportation the next, depending upon whether he actually engaged in interstate commerce); *Dole*, 738 F.Supp. at 1319. Instead, the exemption as applied to an individual employee depends upon the activities of the individual; what is controlling is the character of the activities involved in the performance of his or her job. *Bishop v. Petro-Chemical Transport, LLC*, 582 F.Supp.2d 1290, 1299 (E.D. Cal. 2008) (citing 29 C.F.R. § 782.2(b)(2)). For an individual employee to fall within the purview of the DOT's authority, the employee must engage in activities that "affect the safety of operation" of the motor-carrier employer. *U.S. v. Am. Trucking Ass'ns*, 310 U.S. 534, 553 (1940).

Notwithstanding the exemption, to ensure an employee's maximum coverage under the FLSA, exemptions under the Motor Carrier Act are construed narrowly against the employer asserting their applicability, and the employer carries the burden of proving that an exemption applies. *Dole*, 738 F.Supp. at 1319 (citing *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945)). Employers who claim that an exemption applies to their employees must show that "the employees fit plainly and unmistakably within its terms." *Worthington v. Icicle Seafoods, Inc.*, 774 F.2d 349, (9th Cir. 1984), *cert. granted in part*, 474 U.S. 900 (1985), *and judgment vacated on other grounds*, 475 U.S. 709 (1986).

**MEMORANDUM DECISION AND ORDER - 15**

An employer can establish that the Motor Carrier exemption defense applies by showing that (1) a driver can reasonably be expected to drive across state lines, or (2) the driver hauled goods in "the practical continuity of movement" in interstate commerce. *Shoemaker*, 2011 WL 836998, at *7 *Bishop*, 582 F.Supp.2d at 1298 (citing *Watkins v. Ameripride Serv.*, 375 F.3d 821, 825-26 (9th Cir. 2004)). "A driver is considered to be driving in interstate commerce if the driver is called upon to drive in interstate commerce as part of the driver's regular employment, or, even if the driver has not personally driven in interstate commerce, if, because of company policy and activity, the driver could reasonably be expected to drive in interstate commerce." *Bishop*, 582 F.Supp.2d at 1298. Therefore, if a carrier is engaged in interstate work and assigns drivers randomly to that driving, all of its drivers are considered subject to the Motor Carrier Act. *Bishop*, 582 F.Supp.2d at 1298 (citing *Dole,* 738 F.Supp. at 1322 ([t]o prove the defense, employer must (1) engage in interstate commerce; and (2) its drivers could reasonably have been expected to make interstate runs.))

But a driver is not subject to the Motor Carrier Act "if there is no possibility of driving interstate or the possibility is remote." *Dole*, 738F.Supp. at 1322. Factors to consider in determining whether the Motor Carrier exemption applies to an entire class of employees when only a few are involved "in interstate commerce," are: (1) the proportion of interstate to intrastate employee activity; (2) the method by which a carrier assigns the interstate activity to its employees; and (3) the overall nature of the carrier's business. *Kosin v. Fredjo's Enterprises, Ltd.*, No. 88 C 5924, 1989 WL 13175 (N.D. Ill. Feb. 14, 1989). Nevertheless, transportation within a single state is still considered in "interstate

**MEMORANDUM DECISION AND ORDER - 16**

commerce" if it forms part of a "practical continuity of movement" across state lines from a point of origin to its final destination. 29 C.F.R. § 782.7(b)(1). Intrastate deliveries are considered part of interstate commerce "if the property in question was originally delivered from out-of-state and the intrastate route is merely part of the final phase of delivery." *Watkins v. Ameripride Servs.*, 375 F.3d 821, 826 (9th Cir. 2004).

The parties do not dispute that CB is a motor carrier subject to DOT jurisdiction and that Plaintiffs were CB's employees during the relevant times. The parties also agree that Plaintiffs were engaged in driving, an activity that directly affects highway safety. *See Levinson v. Spector Motor Serv.*, 330 U.S. 649 (1947).

The central dispute is whether CB's entire pool of employees was engaged in interstate commerce such that all of its driver employees were exempt from the overtime requirements of the FLSA. CB does not take each individual Plaintiff's claims to task. Rather, CB argues that its entire "pool of drivers" was exempt from the FLSA's overtime requirements because any one of its drivers could be called upon to drive in interstate commerce at any time. CB focuses upon the "reasonable expectation" test in its briefing, arguing that even if a driver in its pool has not driven across state lines, CB's company policy dictated that drivers could reasonably be expected to drive interstate during the time period in the complaint--from September 1, 2009 through August 2012.. (Def.'s Mem. at 43—44, Dkt. 37-1; Def.'s Reply Mem. at 9, Dkt. 57; Comp. at ¶, Dkt. 1-2.) Alternatively, CB argues that, even if its drivers were not driving interstate, its pool of drivers was nonetheless involved in interstate commerce because CB hauled goods in a "practical continuity of movement" across state lines.

**MEMORANDUM DECISION AND ORDER - 17**

**C.      Whether Drivers Could Reasonably Be Expected to Drive Interstate**

Because CB claims that the Motor Carrier exemption applies to all of its milk tanker drivers, but only a few actually travelled interstate, the Court must determine whether there was a reasonable expectation that any of CB's drivers could be called upon for interstate hauls. Importantly, the question of whether there was a reasonable expectation is not answered by considering whether an individual driver expects that he or she could be called upon to drive interstate. *Reich v. Am. Driver Serv., Inc.*, 33 F.3d 1153, 1157 (9th Cir. 1994) (holding that "a driver's or motor carrier's reasonable expectations" are not relevant to determining whether a driver "could 'reasonably have been expected to make of the carrier's interstate runs'"). Rather, the question is answered by examining objective criteria, such as the method by which a carrier assigns the interstate activity to its employees and the overall nature of the carrier's business. *Shoemaker*, 2011 WL 836998, at *8-9.

### (1)      *CB's method of assigning interstate activity*

CB argues that it assigned its employees to vacant routes as needed. Plaintiffs argue that they were assigned regular, intrastate routes, and when a vacancy arose, CB assigned a relief driver to fill it. The method by which a carrier assigns interstate work can exempt its entire pool of employees under the Motor Carrier Act; if interstate hauls are assigned on an indiscriminate or random basis, it is likely that an employer's pool of

drivers[9] are exempt from the FLSA. *See, e.g., Dole*, 738 F.Supp. at 1319 (citing *Brennan v. Schwerman Trucking Co.*, 540 F.2d 1200, 1205 (4th Cir. 1976)). That a driver can be indiscriminately assigned to interstate hauls defines the character of his work, and it is "the character of the employee's activities rather than the proportion of either his time or his activities that determines the actual need for the Commission's power to establish qualifications or maximum hours of service." *Starrett v. Bruce*, 391 F.2d 320, 322-323 (10th Cir. 1968).

Interstate activity may be indiscriminately assigned when an employee's interstate travel is dictated by that employee's duties rather than by an assigned route. For example, in *Badgett v. Rent-Way, Inc.*, the plaintiff employees were required to deliver merchandise between their employer's various stores and to customer's homes. 350 F. Supp. 2d 642, 652 (W.D. Pa. 2004). These deliveries potentially could require interstate travel because some of the employer's stores and some customer homes were out-of-state. *Id.* at 657.  The parties agreed that, because of this potential as part of the employees' duties, the plaintiffs could have been required to travel to these out-of-state stores and homes. *Id.* In light of these undisputed facts, the court found that the record was "sufficiently developed to establish, beyond any genuine dispute, that [the employees], at all times, could reasonably be expected to engage in interstate commerce driving on behalf of [the employer]." *Id.* at 658. Thus, when an employee is required to

---

[9] This case is limited to the milk tanker drivers. The Court does not intend to limit the application of the Motor Carrier exemption in general to apply only to drivers. Employees other than drivers, such as mechanics, may be subject to the exemption from the FLSA overtime requirements under the Motor Carrier Act. 29 C.F.R. § 782.2(b)(1) (exemption is applicable to drivers, driver's helpers, loaders, and mechanics).

**MEMORANDUM DECISION AND ORDER - 19**

travel interstate because of the character of his or her duties, rather than because of a route assigned by his or her employer, interstate work is indiscriminately assigned.

Other signs that interstate activity is assigned indiscriminately may include a random assignment system. For example, in *Reich*, the employer "indiscriminately assigned any interstate travel to its drivers using a 'first in, first out' method, and therefore, all of its drivers reasonably could have been expected to engage in interstate commerce." 33 F.3d at 1155.  But in *McGee v. Corporate Express Delivery Systems*, the court held that the employer failed to establish that route assignments were indiscriminate as a matter of law, because evidence suggested that routes were assigned on a "permanent or quasi-permanent basis . . . ." No. 01-C-1245, 2003 WL 22757757, at *7 (N.D. Ill. Nov. 20, 2003).

Because the exemption does not apply if the potential of driving interstate is remote, an employer does not establish that there was a reasonable expectation that its employees could drive interstate when it merely indiscriminately fills vacant interstate routes with drivers who otherwise have regular, intrastate routes. *See, e.g., id.* at *7 (holding that for the purposes of summary judgment "it is not enough for [the employer] to show that when a vacancy arises, the unmanned route is randomly assigned").

In *Kosin*, the defendant relied "heavily on the fact that drivers are indiscriminately assigned to fill vacancies resulting from permanent or temporary absences." 1989 WL 13175, at *4. The court, however, noted that the "more important fact for our inquiry is the procedure by which [the employer] assigns drivers to the routes during normal operations." *Id.* The employer did not dispute "that drivers are specifically assigned to all

of the routes on a permanent basis." *Id.* Due to these permanent assignments, the court found that, even though the employer may have filled unexpected vacancies indiscriminately, the employer nonetheless failed to "establish that all drivers could at some time travel interstate routes." *Id.* Unless the employer establishes that it normally assigns interstate travel indiscriminately, it does not establish that there is more than a remote possibility that its drivers will travel interstate.

Here, despite the representations of Carlson and Thompson, the Court cannot conclude that CB has met its burden of presenting sufficient undisputed facts establishing that, between September 2009 and August 2012, all of its drivers were subject to the jurisdiction of the DOT such that they were exempt from FLSA overtime requirements. Construing the evidence in a light favorable to the Plaintiffs, as it must, and making all reasonable inferences in Plaintiffs' favor, CB does not carry its burden of proving that all CB drivers had a reasonable expectation of driving in interstate commerce, because there are disputed issues of fact concerning CB's route assignment practices.

Although Thompson states that all of CB's drivers were subject to being scheduled to drive across state lines, Thompson's method of choosing routes and assigning drivers in emergencies does not lead to that inference. Instead, Thompson assigned CB's drivers to regular routes, which they drove multiple days a week. Thompson does not state the method that he used to schedule these routes. But according to Plaintiffs, once they were assigned to their regular routes, their routes did not change from day to day. Thus, whether Plaintiffs drove interstate depended on their assigned route. This conclusion is supported by Ferguson's statement that he drove a regular assigned route from October of

**MEMORANDUM DECISION AND ORDER - 21**

1998, to January 24, 2010. And Dalrymple stated that he was asked to take interstate runs in February 2010, but after that, he declined to accept any more interstate hauls and did not travel interstate again, leading to the inference that driver preference may have played a part in Thompson's route scheduling.

Additionally, CB's system of filling vacant routes with drivers who otherwise had regular, intrastate routes does not conclusively establish that CB indiscriminately or randomly assigned interstate travel when a route became vacant. Thompson states that when he assigned drivers to additional loads, he would make the assignment "depending on a variety of factors." (Thompson Aff. ¶15 Dkt. 39.) These factors included the availability and present location of the driver, and the perishable nature of the product. In other words, the system was not entirely random, like the "first in, first out" system of *Reich*. Rather, CB's system is similar to the system of "permanent or quasi-permanent" routes used by the employer in *McGee*. Finally, Plaintiffs represented that CB utilized "relief drivers" to fill vacant routes or for emergency purposes, and Dalrymple states that he actually was a relief driver.

CB's policy of requiring all drivers to maintain DOT compliance, so that Thompson could call on any driver at any time to drive interstate, is similarly insufficient to carry the day. That any driver is inherently capable of driving interstate is not the test. Rather, it is whether the driver "could reasonably have been expected to make one of the carrier's interstate runs." *Reich*, 33 F.3d at 1157. And here, there are disputed issues of material fact concerning CB's route assignment process. The record does not support a finding that CB indiscriminately assigned interstate routes among all its drivers.

**MEMORANDUM DECISION AND ORDER - 22**

Therefore, the Court must refrain from applying the Motor Carrier Act so as to exempt all CB drivers, including Plaintiffs, from the overtime provisions of the FLSA.

### (2)   *Overall nature of CB's business*

CB argues that interstate travel is an "integral part" of its business and that it relies on its ability to assign its drivers to interstate hauls. CB characterizes the nature of its operations as an "interstate" trucking company based upon the percentage of interstate hauls, and its requirement that all drivers maintain compliance with DOT regulations and Federal Motor Carrier Safety Regulations ("FMCSR"). But, CB's reasoning is flawed in several respects.

To determine whether interstate travel is part of an employer's normal course of business, courts consider "whether the employer has the capacity to operate across state boundaries, holds itself out to potential customers as available for interstate business and actively solicits such business." *Kosin*, 1989 WL 13175, at *4. A clear example of this type of employer is UPS, a global shipping company whose business was "devoted entirely to interstate commerce." *Shoemaker*, 2011 WL 836998, at *9.

In *Morris*, interstate travel was an integral part of the employer's business because the employer distributed interstate trips "generally throughout the year and their performance was shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce." 332 U.S. at 433. This was demonstrated in part through evidence that, "throughout the year, among the total of 43 drivers, every driver, except two, made at least one [strictly interstate commerce trip] with interstate freight" *Id.* The Court

**MEMORANDUM DECISION AND ORDER - 23**

considered this evidence of the employer's "engage[ment] in a general cartage business," and evidence that the employer was "prepared and offering to serve the normal transportation demands of the shipping public in an industrial metropolitan center." *Id.* These trips were part of the employer's "normal course of business" because they were "a natural, integral and apparently inseparable part of the common carrier service of the petitioner and of his drivers." *Id.*

In contrast to UPS and *Morris*, the nature of CB's trucking business is not that of a worldwide, nationwide, or even regional motor carrier. Although there is no dispute that 4% of CB's raw milk hauls were transported from Oregon to Idaho and 14% of its total interplant deliveries were interstate between September 2009 and August 2012, these statistics are insufficient to overcome the practical realities of CB's operations. Unlike in *Morris*, where interstate travel was mingled in with a driver's performance of other driving services, and UPS, which is a world-wide shipping company that utilizes a trucking fleet to make its package deliveries, the record here supports the inference that CB operates out of a hub for specific clients with drivers who drove regular routes. CB's interstate services may be confined to a specific driver or drivers who drove that route every week. And in contrast to *Morris*, which operated a general cartage business, CB has specific clients (Darigold), set routes between dairy farms and processing plants, and firmly established dairy and plant locations. There is no evidence in the record that CB held itself out as offering services to other farms, plants, or clients on a regional or national scale. Drawing all inferences in Plaintiffs' favor, the Court cannot say on the

**MEMORANDUM DECISION AND ORDER - 24**

record before it that CB's interstate trucking services are a "natural, integral and apparently inseparable part" of CB's business.

Next, CB contends its driver compliance with DOT regulations is evidence of its interstate trucking activities. In making this argument, CB relies on the reasoning of *Shoemaker*, *Marshall*, *Dole*, and *Gonzalez*. CB is correct that driver compliance with federal regulations is a factor the Court considers when determining whether interstate travel is a part of the employer's normal course of business. *See, e.g. Shoemaker*, 2011 WL 836998, at *8 (noting that the employee "maintained DOT compliant licensing and medical certification at all times during his employment," which evidenced the employer's "intent that [the employee] could be called upon to drive [the employer] package car if necessary."). In relying on these cases, however, CB fails to consider that DOT compliance is but one factor, among others, when determining the nature of an employer's business.

In *Marshall v. Aksland*, the issue before the court was whether the availability of the Motor Carrier exemption "turns on the reasonableness of the carrier's expectation of getting interstate business." 631 F.2d 600, 603 (9th Cir. 1980). In its analysis, the court did not directly address the employer and employees' compliance with federal regulations, but did note that the employer "held itself out to the general public as being available for interstate business, actively solicited such business, and was able to handle such business as it got, as well as such as it might have received." *Id.* Thus, although the employer and employees maintained compliance with federal regulations related to the employer's ability to handle interstate business, DOT compliance was but one factor in

MEMORANDUM DECISION AND ORDER - 25

the court's decision that the pool of employees was exempt from FLSA's overtime requirements.

In *Dole*, despite evidence that the employer required its drivers to maintain compliance with federal regulations, the Court denied summary judgment for the employer because the record did "not support a finding that [the employer] indiscriminately assigned interstate routes among all drivers" during the relevant times. 738 F. Supp. at 1321. Thus, the evidence of federal regulation compliance, on its own, was insufficient to overcome a failure to submit sufficient evidence of indiscriminate interstate route assignment.

Finally, in *Gonzalez v. Smith Int'l Inc.*, the employer required its employees to maintain DOT compliance.  -- F.Supp.2d --, 2010 WL 8971797 (S.D. Tex 2010). But the employer also maintained shops in two states, delivered and picked up equipment from out-of-state, drove equipment out-of-state for repair, and provided rental and operation services in over nine states. *Id.* at *9. Furthermore, in its decision, the court relied on the fact that the plaintiff drivers did not dispute they "were subject to being called to drive in interstate commerce when [their employer] needed them to do so." *Id.* at *10.

CB argues also that the DOL already determined that the pool of CB's drivers fall under the Motor Carrier exemption. The DOL narrative, however, is of limited persuasive value for two reasons. First, "[i]t is clear that the agency with whose interpretation the exemption in issue is concerned is not the Department of Labor, but rather the Department of Transportation." *Benson v. Univ. Ambulance Serv.*, 675 F.2d 783, 785 (6th Cir. 1982). Second, DOT reports that fail to address the entire time period at issue are of

MEMORANDUM DECISION AND ORDER - 26

only persuasive value. *Dole*, 738 F.Supp. at 1320. Here, the relevant period of time is from September 1, 2009 to the present, but the DOL narrative was signed on March 31, 2010. Thus, the narrative, at most, only addresses seven months of relevant time.

In conclusion, the evidence before the Court regarding the method in which CB assigned its drivers to interstate travel and the nature of CB's business raise material questions of fact as to whether there was a reasonable expectation that Plaintiffs, as part of a pool of drivers, could be called upon to drive interstate. Because of these material and disputed factual questions, the Court cannot grant CB's motion for summary judgment.

**D.      Whether CB's Activities Form a Practical Continuity of Movement Across State Lines**

CB argues that, even if there was no reasonable expectation that Plaintiffs could be called to travel interstate, its pool of drivers still falls under the Motor Carrier exemption because they hauled goods in a practical continuity of movement. Under the Motor Carrier Act, transportation within a single state is still considered in interstate commerce if it forms part of a "practical continuity of movement." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943). When the intrastate halt in the movement of the goods "is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points." *Id.*, *see also Shoemaker*, 2011 WL 836998, at *8 (holding that employee drivers were involved in a practical continuity of movement because they delivered packages during "the last leg of the package's journey from its original destination to its final delivery place").

**MEMORANDUM DECISION AND ORDER - 27**

In support of its argument that its employees hauled goods in a practical continuity of movement, CB states that, because its drivers "hauled milk and dairy products from dairy farms located in Idaho and Oregon, to processing plants in Idaho, and to customers [sic] plants' [sic] located in Idaho, Oregon, Washington, and Utah," even those drivers who had only intrastate routes "were hauling milk originally from out-of-state."(Def. Mem. Dkt. 37-1 at 22.) At the hearing, CB did not entirely concede this argument, instead stating that the better argument was that it met the "reasonable expectation" test. Therefore, the Court will consider it, albeit briefly.

CB ignores that the action of processing a product "is sufficient to break the continuity of the transportation." *Goldberg v. Faber Indus., Inc*., 291 F.2d 232, 234 (7th Cir. 1961); *see also Shoemaker*, 2011 WL 836998, at *8 (noting that the packages delivered in a practical continuity of movement did "not change character or shape during their journey"). In *Goldberg*, drivers hauled meat scraps to processing plants and never crossed state lines while doing so. 291 F.2d at 234. The court found that under the Motor Carrier Act, the drivers were not engaged in transporting property in interstate commerce because "the transportation must be part of a through movement, originating in or destined to a point in another state." *Id.* Because the drivers delivered the products for processing and processing broke the continuity of movement, the drivers were not engaged in interstate transport.

Here, like the drivers in *Goldberg*, CB's drivers deliver products for processing. Some of CB's routes originate from out-of-state farms and end at processing plants in Idaho. But CB admits that other drivers who drive interplant hauls solely intrastate pick

up processed product that, although originating from raw milk that may have come from out-of-state farms, has been transformed into cheese, buttermilk, or other products. From the processing plant, the milk products are hauled to another plant or for resale.

Therefore, because CB's drivers deliver product for processing, and processing breaks the continuity of transportation, CB has failed to present sufficient evidence to meet its burden of establishing its driving activities constitute the practical continuity of movement in interstate commerce.

### E.     Whether CB Is Entitled to Summary Judgment as Against those Drivers Who Did Not Submit Affidavits

CB argues it is entitled to summary judgment as to those drivers who did not individually respond to its motion for summary judgment. But CB's argument is at odds with its contention that its entire pool of drivers was exempt from the overtime requirements of the FLSA. CB's argument is based on the premise that the activities of any one driver are unimportant, because it seeks to include all of its drivers within the Motor Carrier Act exemption as a "pool" of drivers. Additionally, CB bore the burden of proving that each driver fell under the Motor Carrier exemption, so if it wanted the Court to make a decision regarding each individual Plaintiff, it should have presented evidence relating to each Plaintiff's status under the exemption. *See Dole*, 738 F.Supp. at 1333-23 (employer may have some employees subject to the Motor Carrier Act exemption, but that does not mean all employees are automatically exempt from the FLSA; and, a driver's status may change during the course of his or her employment).

**MEMORANDUM DECISION AND ORDER - 29**

While CB did present evidence that some Plaintiffs engaged in interstate travel, it has not presented evidence to establish that, if the DOT ever had jurisdiction over those Plaintiffs, it was for more than just the four months after they drove interstate.[10]

### F.    Preemption of Idaho State Law Claims

CB argues that  "Plaintiffs' claims for overtime compensation are preempted by the FLSA,"  and that even if the claims are not preempted, they are barred by the six-month statute of limitations, and that "Plaintiffs' state law claim also fails for all the reasons their FLSA claim fails." (Def. Mem. Dkt. 37-1 at 23-24.) Plaintiffs respond that "this Court already made a determination on the matter of conflict preemption of Plaintiffs' state law claims," but do not address CB's arguments regarding the statute of limitations or the state law claims' validity as a matter of law. (Pl. Mem. Dkt. 56 at 15.)

This Court did previously find that the state law claims were not preempted. In its order responding to CB's motion to dismiss, the Court stated:

> CB argues Plaintiff's state law claims under Idaho's Wage Claim Act are preempted . . . . CB has not cited any authority establishing the FLSA preempts application of Idaho's wage claim statute in its entirety. And, this Court has routinely considered complaints alleging both violations of Idaho's Wage Claim Act and the FLSA, deciding whether claims fall within either of the two statutes. *See Goody v. Jefferson County*, No. 4:09–CV–437–B LW, 2011 WL 2582323 * 4 (D. Idaho June 29, 2011) ("section 45–614 is initiated only as 'provided by any law,' in this case the FLSA," and determining liquidated damages under the FLSA); *Wood v. Kinetic Sys., Inc.*, No.

---

[10] Under a DOT Notice of Interpretation, "evidence of driving in interstate commerce or being subject to being used in interstate commerce should be accepted as proof that the driver is subject to [DOT jurisdiction] for a 4-month period from the date of proof." 46 Fed. Reg. 37,902.

> 1:09–CV–579–CWD, 766 F.Supp.2d 1080, 1085–86 (D. Idaho Feb.4,
> 2011) (considering application of Idaho's Wage Claim Act to
> employee's claims for breach of contract and unpaid wages asserted
> alternatively under the FLSA).

(Dkt. 22 at 7.)

Renewing its argument that the FLSA preempts Idaho's wage claim statute, CB cites to two District of Arizona cases. In *Wood v. TriVita, Inc et al.*, the court held that a plaintiff could not "bring suit for a violation of the FLSA" and then also seek a remedy through Arizona's wage law, which provided treble damages for overtime pay allegedly due under the FLSA. 2008 WL 6566637, at *3 (D. Ariz. 2008). The court reasoned that allowing a remedy outside the FLSA "would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the FLSA," and stated that "overtime claims [] directly covered by the FLSA must be brought under the FLSA." *Id.* The court in *Colson v. Avnet, Inc.* followed the reasoning in *Wood* and dismissed the plaintiff's Oregon and Arizona state law claims that would "'rise and fall' with her federal claim," because both state law claims were "wholly dependent on the success of [her] FLSA claim." 687 F.Supp.2d 914, 923 (D. Ariz. 2010).

While the courts in these cases did take a different approach than this Court, their decisions are not binding and there is nothing to suggest that the Court's prior reasoning is erroneous.

The Court also previously addressed whether Plaintiff's claims were barred under the six month statute of limitations in Idaho Code § 45–614, but did not decide the issue. In the order responding to CB's motion to dismiss, this Court noted:

**MEMORANDUM DECISION AND ORDER - 31**

> CB correctly asserts that Plaintiffs' claims under Idaho law may be barred
> by the applicable six month limitation period in Idaho Code § 45–614. In
> *Wood*, the Court found that the six month statute of limitations period
> barred Mr. Wood's claims for unpaid overtime and vacation pay asserted
> under Idaho's Wage Claim Act because he filed suit ten months after his
> employment was terminated. Nevertheless, the Court cannot rule in favor of
> CB on its motion to dismiss. *Wood* was decided upon a motion for
> summary judgment. Here, in contrast, without sufficient facts established
> through discovery and presented to the Court for consideration, the Court is
> unable to decide the issue. CB is certainly free, however, to raise the statute
> of limitations as an affirmative defense in its answer.

(Dkt. 22 at 7.)

Beyond stating that Plaintiffs' claims are barred by the statute of limitations, CB

makes no further argument nor does it present additional evidence. Plaintiffs do not

respond to CB's claim that their claims are barred. Therefore, CB has failed to present

sufficient facts for the Court to decide the issue at this stage in the proceedings.

Finally, CB is not entitled to summary judgment on Plaintiffs' state law claims for

the same reasons CB is not entitled to summary judgment on Plaintiffs' FLSA claims.

## 2.     Motion to Amend Complaint

On May 16, 2012, the Court entered a case management order governing the

proceedings in this matter. The following deadlines govern the proceedings: joinder of

parties and amendment of pleadings to occur no later than December 28, 2012; factual

discovery, including expert witness disclosures, completed before May 24, 2013;

dispositive pretrial motions before June 28, 2013; and a VCMC on or before August 17,

2012. Trial is set to begin on October 28, 2013. United States Magistrate Judge Larry M.

Boyle conducted a voluntary case management conference on October 23, 2012, which

resulted in a stipulation governing the parties' summary judgment briefing schedule. (Dkt. 29, 30, 21.)

CB timely filed its motion for summary judgment on January 28, 2013, according to the parties' stipulated deadline for doing so. Plaintiffs moved for leave to file a third amended complaint on December 28, 2012, which was the deadline specified in the Court's order.[11] Sturm seeks to add seven new plaintiffs to the nine previously named plaintiffs. Plaintiffs claim that the seven individuals were not previously identifiable or agreeable to being named plaintiffs prior to this time.

Rule 15(a) provides that, except for amendments allowed as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave [and][t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15(a)'s liberal amendment policy contributes to the overarching policy of the Federal Rules of Civil Procedure—"to facilitate a proper decision on the merits," *Conley v. Gibson*, 355 U.S. 41, 48 (1957)—by allowing parties to have an opportunity to present their best case based on claims and defenses that, for one reason or another, may have become apparent only after the pleadings have been filed.

The United States Supreme Court, in interpreting Rule 15(a), has set forth the standard to be applied by the district courts:

> If the underlying facts or circumstances relied upon by a
> plaintiff may be a proper subject of relief, he ought to be
> afforded an opportunity to test his claims on the merits. In the

---

[11] Plaintiffs' first amended complaint was filed before CB filed a responsive pleading. (*See* Dkt. 1.) Plaintiffs' second amended complaint was filed because of the Court's ruling regarding CB's motion to dismiss, which granted Plaintiffs leave to amend. (*See* Dkt. 22, 23.)

**MEMORANDUM DECISION AND ORDER - 33**

> absence of any apparent or declared reason-such as undue
> delay, bad faith or dilatory motive on the part of the movant,
> repeated failure to cure deficiencies by amendments
> previously allowed, undue prejudice to the opposing party by
> virtue of allowance of the amendment, futility of amendment,
> etc.—the leave sought should, as the rules require, be "freely
> given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962). The United States Court of Appeals for the Ninth Circuit holds that these factors are not of equal weight; specifically, "delay alone no matter how lengthy is an insufficient ground for denial of leave to amend." *U.S. v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981). The most important factor is whether amendment would prejudice the opposing party. *Howey v. U.S.*, 481 F.2d 1187, 1190 (9th Cir. 1973). In some circumstances, it is not an abuse of discretion to deny a motion to amend where the case has advanced too far on the merits. *Hayes v. Corrections Corp. of Am.*, No. 1:09-cv-122-BLW, 2012 WL 4481212 *20 (D. Idaho Sept. 28, 2012).

CB argues first that, if the motion is granted, Plaintiffs may need additional discovery and time to respond to the pending motion for summary judgment. Plaintiffs did not ask for additional time to respond to the motion for summary judgment. Given that the summary judgment motion will be denied, this reason for CB's objection to the motion to amend is now moot.

CB has not identified any other "delay and prejudice" that would result, other than simply stating generally that there will be delay and prejudice. CB asserts that Plaintiffs never raised the possibility of adding individuals to this proceeding at any time during the VCMC and prior to agreeing upon a summary judgment briefing schedule. On the

**MEMORANDUM DECISION AND ORDER - 34**

contrary, Plaintiffs' complaint put Defendants on notice that there were potentially as yet

unnamed individual plaintiffs. Plaintiffs included "John Does 1-20" as named parties in

the caption of the Second Amended Complaint and the Amended Complaint. And John

Does 1-20 were described in both prior versions of the Complaint as "other individuals or

employees of Defendant" who were unknown, but whose claims against Defendant are

similar to the Plaintiffs' claims. In other words, they drove milk tanker trucks between

September 1, 2009, and the time the Complaint was filed, and were paid hourly wages.

CB employed approximately 25-35 milk tanker drivers in Caldwell, Idaho, at any given

point in time between September 2009 and February 2012, when the complaint was filed.

(Thompson Aff. ¶12, Dkt. 39.) Thus, the pool of drivers is finite, and not that large. CB

undoubtedly knew who those drivers might be.

        In addition, the parties represented at the hearing that the delay and prejudice may

have been of their own making. The parties apparently agreed to limit discovery because

of the pending motion for summary judgment, which had the potential to resolve the

lawsuit if it were granted. But both parties took the risk that the summary judgment

motion could be denied, thus prolonging the discovery process because of the inactivity

resulting from an amicable stay while the motion was pending. For these reasons, the

Court will grant Plaintiffs' motion for leave to name additional Plaintiffs. But the Court

agrees with CB that no further amendments to add plaintiffs will be permitted.

        Next, CB argues that the accrual of the limitations period for the newly

identified plaintiffs should begin on the date the third amended complaint is filed. CB

contends that the newly added plaintiffs' claims should not "relate back" to the filing of

**MEMORANDUM DECISION AND ORDER - 35**

the original complaint for statute of limitations purposes, and bases its argument upon Rule 15(c). Plaintiffs contend they meet the "relation back" test, and the newly added plaintiffs should be entitled to have any and all rights to compensation relating back to the October 31, 2011, filing date. The Court understands CB's argument to mean that the newly added plaintiffs should not be able to avail themselves of the original filing date for purposes of the two or three year statute of limitations provision under the FLSA, given that this is not a collective action. Plaintiffs counter that the newly added plaintiffs should not be penalized and lose their back wages because they joined the lawsuit later, given the same facts apply to them as well.

Rule 15(c) provides that an amendment to a pleading "relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading. . . ." changes the party or the naming of the party against whom a claim is asserted. . . ." Fed. R. Civ. P. 15(c)(1)(B). The Rule does not expressly provide for relation back of an amendment that adds new plaintiffs, but the 1966 Advisory Committee Notes state that "the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs." Fed. R. Civ. P. 15(c), 1966 Advisory Committee's Notes. The chief consideration is the statute of limitations. *Id.*

Under the FLSA, an employee must commence his or her action within two years after the cause of action accrued, except in the case of a "willful" violation, which must be commenced within three years after the cause of action accrued. 29 U.S.C. § 255(a). Back wages are similarly limited; an employee is permitted to recover back wages for the

two or three year period (dependent upon proof of a willful violation) prior to the

commencement of the lawsuit. *Andrews v. DuBois*, 888 F.Supp. 213, 220 (D. Mass.

1995). Under 29 U.S.C. § 256, an action commenced under the FLSA "shall be

considered to be commenced on the date when the complaint is filed; except that in the

case of a collective or class action" under the FLSA, it shall be considered to be

commenced in the case of any individual claimant either: (a) on the date the complaint

was filed, if he or she is specifically named as a party and written consent to become a

party is filed on such date; or (b) if written consent was not filed or he was not named as

a party on the date on which the written consent was filed.

Plaintiffs have not pursued collective action certification, so 29 U.S.C. § 256 is of

little guidance here. Neither is the case law cited by CB, because *Besig* discusses

substitution of one plaintiff for another, or a named defendant for a Doe defendant,

whereas Plaintiffs want to add, not substitute, individuals. *See Besig v. Dolphin Boating

and Swimming Club*, 683 F.2d 1271, 1278-9 (9th Cir. 1982) (discussing an amendment

changing plaintiffs entirely); *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996)

(discussing relation back in the context of substituting named defendants for Doe

defendants).

The Court instead finds the reasoning in *Anderson v. City of Wood Dale, IL*, No.

93 C 425, 1995 WL 106318 (N.D. Ill. Mar. 9, 1995), persuasive. There, thirty-nine

individual plaintiffs filed suit in December of 1992, alleging FLSA violations. On May 6,

1993, the plaintiffs filed an amended complaint deleting one plaintiff and adding six

more. The plaintiffs again amended their complaint in June of 1994, adding five more

**MEMORANDUM DECISION AND ORDER - 37**

named plaintiffs. All of the new plaintiffs' causes of action arose from the same type of conduct set forth in the original complaint. There, like here, the defendants argued that the claims of the newly added plaintiffs did not relate back to the initial date of filing for statute of limitations purposes.

The Illinois court held that the new plaintiffs' claims did not relate back, because of the need to limit the defendant's potential liability, and to prohibit plaintiffs from joining an action at their convenience. *Anderson*, 1995 WL 106318 *3. The court found that the facts were different surrounding each plaintiff's hiring and termination dates, and that plaintiffs had not offered any persuasive justification as to why the additionally named plaintiffs were not named in the original complaint. *Id.* Rather, the court observed that it seemed the plaintiffs were added when it became more convenient for them to do so. *Id.* And the court found the additional discovery burden placed upon the defendant was prejudicial. Thus, the court allowed the new plaintiffs to be added, but the operative dates for purposes of fixing exposure or liability of the defendant were the filing dates of the respective complaint naming each plaintiff. *Id.* at *4.

Here, too, Plaintiffs have not offered a persuasive reason why the newly added parties could not have been named in the original complaint. The same argument—that the pool of milk tanker drivers was finite—holds true for finding Plaintiffs could have been more diligent in seeking out additional individuals. At the hearing, Plaintiffs' counsel represented that the new plaintiffs feared losing their jobs, so they did not join with Sturm and the others. Plaintiffs further conceded that the new individuals could file a separate complaint. Now that the newly identified individuals all have been terminated

**MEMORANDUM DECISION AND ORDER - 38**

from their employment, it is convenient for them to hop on board. Individuals should not be permitted to wait on the sidelines and sit on their hands, and later benefit from doing so.

The Court concludes that the relation back doctrine does not apply to the proposed additional plaintiffs. The operative date for purpose of identifying and fixing CB's maximum potential exposure or liability period will be December 28, 2012, the date that Plaintiffs moved to add the additional plaintiffs, and filed their proposed amended complaint with the Court.[12] But the Court makes no determination as to whether the new Plaintiffs' claims are barred by the statute of limitations. Neither party presented evidence concerning the other aspect of the statute of limitations—namely, when the cause of action accrued for purposes of finding any of the plaintiff's suits time-barred.

## CONCLUSION

CB is not entitled to summary judgment because it has failed to carry its burden of proving that its entire "pool" of drivers, which includes Plaintiffs, is exempt from the FLSA's overtime requirements. The evidence is disputed regarding whether there was a reasonable expectation that Plaintiffs, as part of CB's driver pool, could be called upon indiscriminately to travel interstate. Furthermore, as this Court has already stated, Plaintiffs' state law claims are not preempted by the FLSA. Finally, the Court will allow

---

[12] In *Anderson*, the court did not consider whether the date of the motion, or the date of the filing of the amended complaint, would be the operative date because the complaints were filed prior to defendants' motion for summary judgment, which raised the issue for the first time. Here, in contrast, Plaintiffs filed their motion to add the new individuals timely (on the last day to do so), and they should not be penalized because the Court could not hear their motion until completion of the briefing schedule and scheduling of oral argument for both the motion to amend and the motion for summary judgment.

**MEMORANDUM DECISION AND ORDER - 39**

the Complaint to be amended to name the additional plaintiffs. Their claims for liability purposes are fixed as of December 28, 2012. Neither party has presented sufficient evidence concerning the operative date upon which each plaintiff's claim accrued for statute of limitations purposes, so CB's defenses in this regard are reserved for future ruling by the Court, as appropriate.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Defendant's Motion for Summary Judgment (Dkt. 37) is **DENIED**.

2) Plaintiffs' Motion for Leave to File Third Amended Complaint (Dkt. 35) is

   **GRANTED**. Plaintiffs must file their amended complaint within ten (10)

   days of this Order. The effective date of the amended complaint is

   December 28, 2012, consistent with the Court's analysis, above.

Dated: **May 02, 2013**

Honorable Candy W. Dale
United States Magistrate Judge